# Article 10. Participation by Affiliates

## 10.1 Participation in the Plan

Any Affiliate which desires to become an Employer may elect to become a party to the Plan and Trust by adopting the Plan for the benefit of one or more Participating Groups of its Hourly Employees, effective as of the Coverage Date specified in such adoption—

(a)    by filing with the Committee a certified copy of a resolution of its board of directors to that effect, together with such other instruments as the Committee may require; and

(b)    by the Committee's filing with the then Trustee a copy of such resolution, together with a certified copy of resolutions of the Company's Board of Directors approving such adoption.

* * * * * * * * * *

In Witness Whereof, Carlisle Corporation has caused this amended and restated Carlisle Corporation Retirement Plan for Hourly Employees to be executed, on this 26th day of February, 2002, effective as of January 1, 1997, by its proper officers duly authorized by its Board of Directors.

Carlisle Corporation

Attest:

By _____

By _____

Its ___ASSISTANT SECRETARY___

Its ___SECRETARY___

J5

Exhibit 2

# Carlisle Corporation Retirement Plan for Hourly-Paid Employees

(As Amended and Restated Effective as of January 1, 1997)

## Part II Supplement

(As Amended and Restated Effective as of July 20, 2000)

## Pertaining to the Motion Control Industries Division Participating Group

Exhibit 3

# Carlisle Corporation Retirement Plan for Hourly-Paid Employees
(As Amended and Restated Effective as of January 1, 1997)

## Part II Supplement
(As Amended and Restated Effective as of July 20, 2000)

## Pertaining to the Motion Control Industries Division Participating Group

The Motion Control Industries Division Participating Group shall be covered by the Carlisle Corporation Retirement Plan for Hourly-Paid Employees in accordance with the provisions of the Plan on the following basis—

(a)    **Name of Plan:** Retirement Plan for Bargaining Unit Employees of Motion Control Industries Division of Carlisle Corporation. The Plan consists of this Part II Supplement and Part I, the Carlisle Corporation Retirement Plan for Hourly-Paid Employees, which is incorporated by reference into this Supplement, as each is in effect from time to time.

(b)    **Name of Participating Group:** The Motion Control Industries Division Participating Group. (Plan Number 002.)

(c)    **Hourly Employee:** Any hourly-paid person employed by the Motion Control Industries Division of the Company in its Ridgway, Pennsylvania plant and is a member of the bargaining unit represented by Local Union Number 502 affiliated with the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers, AFL-CIO.

(d)    **Coverage Date:** January 1, 1955.

(e)    **Restatement Date:** July 20, 2000.

(f)    **Eligibility and Participation:** The following section 3.1 shall be applicable to the Participating Group—

### 3.1 Date of Participation.

(a)    **Participants as of December 31, 1975.** Each Hourly Employee who was a Participant in this Plan as it existed on December 31, 1975 shall continue to be a Participant hereunder on and after January 1, 1976, providing such Hourly Employee has not terminated his employment or retired.

1

Exhibit 3

(b)    **Other Participants.** On and after January 1, 1976, each person who is or who becomes an Hourly Employee shall become a Participant in the Plan as of the first of the month coincident with or next following the later to occur of (1) or (2) below:

(1)    January 1, 1976; and

(2)    the date he becomes an Hourly Employee.

(g)    **Hours of Service:** Not more than 36 months of involuntary layoff and not more than 36 months of an approved leave of absence shall be recognized as Hours of Service under section 3.4(c) of the Plan. No other modifications or exceptions to section 3.4 of the Plan.

(h)    **Vesting Service:** Section 3.5(b) and (c) shall read as follows for the Participating Group:

(b)    For any employment prior to January 1, 1976, an Employee's Vesting service shall be equal to his period of "continuous employment" with the Employer through December 31, 1975 as determined in accordance with the records of the Employer.

(c)    For employment on and after January 1, 1976, an Employee shall receive credit for a year of Vesting Service for each calendar year in which he has at least 83 1/3 Hours of Service. If an Employee has fewer than 83 1/3 Hours of Service for any calendar year, he shall not receive credit for Vesting Service for that calendar year.

No other modifications or exceptions to the provisions in section 3.5 of the Plan.

(i)    **Credited Service:** Section 3.6(a) and (b) of the Plan shall read as follows for this Participating Group:

(a)    For employment before January 1, 1976, a Participant shall receive credit for Credited Service equal to his period of credited service under the Plan as of December 31, 1975, as determined in accordance with the records of the Employer.

(b)    For employment after December 31, 1975, the Participant's Hours of Service credited to him each Plan Year shall be reduced by any Hours of Service—

(1)    before he becomes a Participant;

(2)    while he is an Inactive Participant; and

(3)    during an involuntary layoff or approved leave of absence in excess of 36 months as described in section 3.4(c).

2

Exhibit 3

The Participant's Credited Service shall then be determined based on such person's remaining Hours of Service for that Plan Year after the above exclusions. Any calendar year in which the Participant completes at least 2,000 of such remaining Hours of Service shall be a year of Credited Service. Any calendar year for which the Participant participates in this Plan for less than 2,000 of such remaining Hours of Service shall constitute Credited Service, to the next one-twelfth of a year, as the number of such remaining Hours of Service for the year bears to 2,000.

(j)   Retirement Age: The following Retirement Ages shall be applicable to this Participating Group:

    (1)   Normal Retirement Age: A Member's sixty-fifth birthday, except that effective as of January 1, 1988, for a Member whose original date of hire is on or after his sixtieth birthday, the later of—

        (A)   his sixty-fifth birthday; or

        (B)   the date he completes five years of Credited Service.

    (2)   Early Retirement Age: Age 50 (but not age 65) and five or more years of Vesting Service.

    (3)   Disability Retirement Age: Incurs a Disability after completing ten or more years of Vesting Service.

    (4)   Vested Retirement Age: Effective as of January 1, 1988, five years of Vesting Service and has not attained age 50.

(k)   Retirement Date: Vested Retirement Date shall be age 50. No other modifications or exceptions to the Retirement Date provisions in Article II of the Plan.

(l)   Amount of Normal Retirement Benefit Under Section 4.1(b) of the Plan: The monthly amount of normal retirement benefit payable to a Member eligible therefor under section 4.1(a) of the Plan and whose Vesting Service terminates on or after July 20, 2000 shall be equal to the product of the amount shown in the chart below, depending upon the date of the Member's retirement, multiplied by the total period of the Member's Credited Service. The chart is as follows:

| Date of Retirement | Monthly Retirement Benefit Per Year of Credited Service |
| --- | --- |
| July 20, 2000 through June 30, 2001 | Twenty-nine dollars ($29.00) |
| July 1, 2001 through June 30, 2002 | Thirty dollars ($30.00) |
| On and after July 1, 2002 | Thirty-one dollars ($31.00) |

ADPLAN-HIC ILL-97-40 × 02/20/07T

Exhibit 3

**Increases in Retirement Benefits.** Notwithstanding the foregoing, if a Member retires on or after July 20, 2000 and before July 1, 2002 with normal, early, or disability benefits commencing during such interval, upon attaining each subsequent July 1 during such interval after his benefit commencement, he shall be entitled to an increased monthly benefit recomputed based on the rate as in effect on each such July 1 as shown in the above chart. Such increases shall not apply to deferred vested retirement benefits under section 4.4.

(m)   **Monthly Reduction of Early Retirement Benefits Under Section 4.2(b) of the Plan:** The monthly early retirement benefit computed under section 4.2(b) of the Plan shall be reduced by 1/15 thereof per year (1/180 thereof per month) for each year of the first five years, and 1/30 thereof per year (1/360 thereof per month) for each year of the next ten years by which the initial payment date precedes the Member's Normal Retirement Age.

(n)   Previously, Section 4.2A of the Plan, **Window Supplemental Early Retirement Benefit,** described window supplemental early retirement benefits for a Window Period beginning on February 1, 1998. There are currently no window supplemental early retirement benefits.

(o)   **Disability Retirement Benefits:** Section 4.3(b) shall read as follows for the Participating Group:

(b)   **Amount.** The monthly disability retirement benefit payable to a Participant eligible therefor under (a) above shall be an amount computed in the same manner as a normal retirement benefit under section 4.1(b), based on his Credited Service at the time of his Disability, without reduction for commencement prior to his Normal Retirement Age, but for a Participant who becomes eligible for a disability benefit on or after July 20, 2000 and before July 1, 2003, the minimum monthly disability benefit shall be as shown below—

| Date of Disability Retirement | Minimum Disability Benefit |
|---|---|
| July 20, 2000 through June 30, 2003 | 5410 |

Such benefit shall be payable until the Participant attains his Normal Retirement Age. Thereafter, the monthly retirement benefit shall be the benefit determined in the same manner as the monthly retirement benefit payable upon retirement at the Normal Retirement Age of the Participant, except that Credited Service and Service shall be determined as of the date of the Participant's termination of employment resulting from such disability.

4

Exhibit 3

(p)     Deferred Vested Retirement Benefits: No modifications or exceptions to the provisions in section 4.4 of the Plan.

(q)     Automatic Preretirement Survivor Annuity for Active and Terminated Married Vested Members: No modifications or exceptions to the provisions in section 4.6 of the Plan. The earliest commencement date for a vested Member shall be when he would have attained his fiftieth birthday.

(r)     Automatic Post-Retirement (Joint and Survivor) Surviving Spouse Benefits: No modifications or exceptions to the provisions in section 4.7 of the Plan.

(s)     Post-Retirement Optional Retirement Benefits under Section 4.8 of the Plan—

   (a)     Option 1—Contingent Annuitant Option. The continuation percentages to the Contingent Annuitant shall be 100, 66 2/3, and 50 percent.

   (b)     Option 2—Ten-Year Certain and Life Option.

(t)     History of Plan under Section 1.2 of the Plan: The Plan was established effective as of January 1, 1955, its Coverage Date. The Plan was amended thereafter from time to time, including amendments to reflect negotiated benefit improvements and to conform the Plan to the Act, amendments to age discrimination laws, and amendments to the Code, including the Tax Reform Act of 1986 and its regulations. The Plan is hereby further amended and restated to conform the Plan to the General Agreement on Tariffs and Trade as approved by the Uruguay Round Agreements Act, the Uniformed Service Employment and Reemployment Rights Act of 1994, the Small Business Job Protection Act of 1996, the Taxpayer Relief Act of 1997, and related regulations and rulings effective as of January 1, 1997 and to reflect negotiated benefit improvements effective as of July 20, 2000.

(u)     Applicability of the Plan: The Plan consisting of the master plan document (Part I) and this Part II Supplement describes the benefits for Members who are in the employment of the Company in the Participating Group on and after July 20, 2000 and who retire or whose Vesting Service terminates on or after July 20, 2000. Any Member in the Plan who retired or whose Vesting Service terminated under the Plan before July 20, 2000 with eligibility for a retirement benefit under the Plan (or the beneficiary of such a Member) shall on and after July 20, 2000 continue to be entitled to receive the same benefit under the Plan as such Member was entitled to receive under all the provisions of the Plan as in effect when the Member's Vesting Service terminated, together with any post-retirement benefit increases that may have been extended to him.

* * * * * * * * * *

5

Exhibit 3

In Witness Whereof, Carlisle Corporation has caused this Supplement to be duly executed in its name and behalf by its proper officers thereunto authorized this 26th day of February, 2002, but effective as of July 20, 2000.

Carlisle Corporation

Attest:

By _~M. Kirman~_

Its _ASSISTANT SECRETARY_

By _J. Frit_

Its _SECRETARY_

6

Exhibit 3

## Schedule A

This Schedule A describes the special supplemental retirement benefits or window supplemental benefits, which are in addition to other retirement benefits payable to a retiree under the Plan. Such benefits are now payable under the Plan effective as of September 1, 1997. Such benefits are payable as a life annuity or will terminate on the dates specified below.

| Name | Social Security Number | Monthly Supplemental Payment | Payment End Date |
|------|------------------------|------------------------------|------------------|
| Bauer, N. F | 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 | $14.02 | N/A |
| Duffee, L. A. | 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 | $1.22 | N/A |
| Shafter, V. A. | 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 | $6.56 | N/A |
| Solley, G. T. | 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 | $7.28 | N/A |
| Stover, C. W. | 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 | $26.87 | N/A |
| Walters, F. H. | 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 | $1.46 | N/A |

7

Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GLENN H. OLAY,                                          )
                                                       )
                Plaintiff                              )
                                                       )
        vs.                                            )
                                                       )
MOTION CONTROL INDUSTRIES,                             )
DIVISION OF CARLISLE                                   )
CORPORATION, RETIREMENT PLAN                           )
FOR BARGAINING UNIT EMPLOYEES                          )
OF MOTION CONTROL INDUSTRIES,                          )    Civil Action No.  04-266E
DIVISION OF CARLISLE                                   )
CORPORATION,                                           )
                                                       )
                Defendants                             )

## DEFENDANTS' ANSWERS TO PLAINTIFF'S INTERROGATORIES

Defendants, through their counsel, Knox, McLaughlin, Gornall & Sennett, P.C.,

serve the following Answers to Plaintiff's Interrogatories:

## GENERAL OBJECTIONS

Defendants object to each of the following interrogatories to the extent:

1.      The interrogatory is vague, ambiguous and overly broad;

2.      Supplying the requested information will subject the defendant to unreasonable annoyance, embarrassment, oppression, burden or expense;

3.      The information sought is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence;

4.      The interrogatory sought calls for disclosure of counsel's mental impressions, conclusions, opinions, memoranda, notes or summaries, legal research or legal theories; and

5.      Supplying the requested information would require defendants to disclose confidential employment or benefits information without the consent of the affected employee or recipient of benefits.

Exhibit 4

1.    How many times since the inception of the Retirement Plan has the

Retirement Plan awarded a disability pension to an individual whose service in the Retirement

Plan was based in full or part on the individual's employment at the Ridgeway, Pennsylvania,

facility of defendant, Motion Control Industries, Division of Carlisle Corporation?

**ANSWER**:

**The inception of the Plan dates back several decades. To ascertain the number of employees who received disability pension benefits based in full or in part upon any service at the Ridgeway, Pennsylvania facility would require the manual examination of the records of individual employees dating over a period of several decades. Therefore, it is unduly burdensome and impractical to determine the number of instances where an employee was granted a disability pension based in full or in part upon any service at the Ridgeway facility. However, the Plan has identified eleven (11) employees of the Ridgeway facility who have received disability pensions since approximately 1987.**

2.    For each instance where an individual received a disability pension in the

circumstances covered by Interrogatory No. 1 above, please state the employment status of the

individual at the Ridgeway, Pennsylvania, facility of defendant, Motion Control, at the time the

disability arose (i.e. active employee, laid off, terminated, etc.).

**ANSWER**:

**Defendants object to Interrogatory No. 2 to the extent that it requests information that is confidential to the individual pension recipient or concerning which the recipient has a reasonable expectation of privacy. Without waiving the foregoing objection, the Plan provides the following information: (Note: individuals are identified by numerical designation rather than by name.)**

**Recipient #1:**

Commencement of disability pension benefits:          July, 2000

Status as of commencement of benefits:          Active employee receiving
sickness and accident ("S&A")
benefits through June 4, 2000

Exhibit 4

**Recipient #2:**

Commencement of disability pension benefits:     March, 2001 (retroactive based upon determination dated October 1, 2002)

Status as of commencement of benefits:     Medical Leave of Absence

**Recipient #3:**

Commencement of disability pension benefits:     April 1, 1997

Status as of commencement of benefits:     Medical Leave of Absence

**Recipient #4:**

Commencement of disability pension benefits:     July 1, 1989

Status as of commencement of benefits:     Medical Leave of Absence

**Recipient #5:**

Commencement of disability pension benefits:     May 1, 2001 (retroactive award)

Status as of commencement of benefits:     Medical Leave of Absence

**Recipient #6:**

Commencement of disability pension benefits:     March 1, 1991

Status as of commencement of benefits:     Receiving S&A benefits

**Recipient #7:**

Commencement of disability pension benefits:     May, 1999 (Retroactive award)

Status as of commencement of benefits:     Terminated as of January 28, 2000; however, recipient was awarded disability benefits retroactive to May, 1999 based upon determination that disability pre-dated termination.

Exhibit 4

**Recipient #8:**

Commencement of disability pension benefits:    January 1, 1999

Status as of commencement of benefits:    Receiving S&A benefits

**Recipient #9:**

Commencement of disability pension benefits:    March, 2000

Status as of commencement of benefits:    Recipient was on a medical leave of absence for thirty-six (36) months. Recipient's employment was terminated on November 14, 2000. However, recipient was awarded disability pension benefits retroactive to March, 2000 based upon determination that disability pre-dated date termination.

**Recipient #10:**

Commencement of disability pension benefits:    July 1, 1996

Status as of commencement of benefits:    Active employee (recipient may have received S&A benefits prior to disability pension benefits and/or may have taken a medical leave of absence).

**Recipient #11:**

Commencement of disability pension benefits:    July 1, 1987

Status as of commencement of benefits:    No further information available.

3.    Has the Retirement Plan ever approved a disability pension for an individual whose service in the Retirement Plan was based in full or part on the individual's employment at the Ridgeway, Pennsylvania, facility of defendant, Motion Control, where the disability arose while the individual was:

Exhibit 4

A.  Temporarily laid off from the Ridgeway, Pennsylvania, facility of defendant, Motion Control;

**ANSWER**:

**No. As a further response:  One disability pension recipient was already on a Medical Leave of Absence when the Ridgeway facility closed and was awarded a disability pension based on a determination that the recipient's disability arose in March, 2001, prior to the plant closure.**

**Another disability pension recipient was terminated effective January 28, 2000, but was later awarded disability pension benefits retroactive to May, 1999 based on a determination that the recipient's disability arose prior to date of termination.**

B.  Permanently laid off from the Ridgeway, Pennsylvania, facility of defendant, Motion Control;

**ANSWER**:

**As described above, a disability pension recipient was terminated effective January 28, 2000, but was later awarded disability pension benefits retroactive to May, 1999 based on a determination that the recipient's disability arose prior to date of termination.**

C.  Not actively working at the Ridgeway, Pennsylvania, facility of defendant, Motion Control, and receiving workers' compensation benefits; or

**ANSWER**:

**The Plan is aware of one employee (Recipient #3) who received workers comp. benefits prior to award of disability pension benefits. It is possible that other recipients also may have received workers comp. benefits at the time of or prior to the award of disability pension benefits; however, this information was not reasonably ascertainable from available records.**

D.  Not actively working at the Ridgeway, Pennsylvania, facility of defendant, Motion Control, and in some other employment status?

Exhibit 4

**ANSWER**:

**Objection: The reference to "some other employment status"
is vague and ambiguous, and defendants cannot ascertain what
information is being requested by this interrogatory.**

4.    If the answer to the preceding interrogatory is yes for any individual,

please provide an explanation of the circumstances regarding, and the basis for, the Retirement

Plan's approval of the disability pension claim in each instance.

**ANSWER**:

**In response to Interrogatory No. 4, the Plan incorporates by reference
its answer to Interrogatory No. 1.**

5.    Was Brad Nortum awarded a disability pension by the Retirement Plan at

a time when he was not actively working at the Ridgeway, Pennsylvania, facility of defendant,

Motion Control?  If so, please provide details regarding his employment status at the time his

disability arose and the basis for the Retirement Plan's decision to approve benefits (in terms of

his eligibility based on employment status and not in reference to the medical aspect of his

claim).

**ANSWER**:

**Mr. Nortum's employment terminated on or about January 28, 2000.
However, it was later determined that Mr. Nortum qualified for a
disability pension as of May, 1999 and he was awarded disability
pension benefits retroactive to May, 1999.**

Exhibit 4

Answers submitted by,

KNOX McLAUGHLIN GORNALL &
SENNETT, P.C.

By: _____
        Richard A. Lanzillo
        120 West Tenth Street
        Erie, PA 16501-1461
        (814) 459-2800

Attorneys for defendants, Motion Control
Industries, Division of Carlisle Corporation,
Retirement Plan for Bargaining Unit
Employees of Motion Control Industries,
Division of Carlisle Corporation

# 660948

Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GLENN H. OLAY,                                  )
                                                )
                Plaintiff                       )
                                                )
        vs.                                     )
                                                )
MOTION CONTROL INDUSTRIES,                      )
DIVISION OF CARLISLE                            )
CORPORATION, RETIREMENT PLAN                    )
FOR BARGAINING UNIT EMPLOYEES                   )
OF MOTION CONTROL INDUSTRIES,                   )   Civil Action No. 04-266E
DIVISION OF CARLISLE                            )
CORPORATION,                                    )
                                                )
                Defendants                      )

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 20th day of March, 2006, a copy of

the within document was served on all counsel of record and unrepresented parties in accordance

with the applicable rules of court.

_____
Richard A. Lanzillo

# 660948

Exhibit 4

LAW OFFICES

# JUBELIRER, PASS & INTRIERI, P.C.

219 FORT PITT BOULEVARD
PITTSBURGH, PENNSYLVANIA 15222-1576

412-281-3850
412-261-0147

JOSEPH J. PASS
NEAL R. CRAMER
ERNEST B. ORSATTI
EDWARD H. WALTER
ROBERT A. EBERLE
JAMES A. WELKER
JASON METTLEY
JOSEPH SANTINO PASS

BEN PAUL JUBELIRER (1904-1983)
FRANK P. G. INTRIERI (1942-1976)

FAX. 412-281-1985

March 23, 2004

VIA FACSIMILE TRANSMISSION
(FAX #1-814-453-4530)
and REGULAR MAIL

Richard W. Perhacs, Esquire
Knox, McLaughlin, Gornall & Sennett
120 W. 10th Street
Erie, PA 16501-1461

Re:    Terry K. Rockwell and Donald A. Davido, Jr.
       Disability Claims with Motion Control Industries

Dear Rich:

I am writing to you in connection with our earlier discussions regarding your client, Motion Control Industries. My firm has been retained to represent Messrs. Rockwell and Davido regarding their claims for disability pensions with Motion Control. Inasmuch as you and I have spoken on a number of occasions about this subject and the various other issues pertaining to Motion Control and IUE/CWA Local 502, I want to communicate separately on behalf of these individual clients.

As I have previously mentioned, I was contacted by these two gentlemen and other former employees of Motion about their possible claims for disability pensions. On one of the earlier occasions you and I spoke (some time early last year) about the subject of disability pensions, you suggested that I write and describe the nature of these claims so that you could review the matter with your client. Belatedly, I am writing now for that reason, and in part my reason for doing so now is to make sure that this issue is on the table prior to any global settlement between Motion Control and Local 502.

Exhibit 5

Richard W. Perhacs, Esqu.
Page 2
March 23, 2004

Regarding Mr. Rockwell and Mr. Davido, please be advised as follows.

Mr. Rockwell began his employment with Motion Control on April 21, 1969. His social security number is 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, and his date of birth is January 19, 1951. His current address is 797 Highland Road, Kane, PA 16735. Mr. Rockwell's last day of work was January 11, 2002, and he received WARN Act pay through March 16, 2002. In May 2002 Mr. Rockwell became disabled as the result of heart disease. He subsequently qualified for Social Security disability benefits in July 2002. Mr. Rockwell apparently made a verbal request for the paperwork to initiate a claim for disability pension benefits with Motion, but he was advised by Robin E. at Motion Control that he was not eligible for the disability pension because he was not working for Motion Control at the time he became disabled.

Mr. Davido began his employment with Motion Control on November 11, 1978. His social security number is 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, and his date of birth is October 1, 1945. His current address is 243 Ash Street, Ridgway, PA 15853. Mr. Davido's last day of work was January 11, 2002, and he received WARN Act pay through March 16, 2002. On May 9, 2002, Mr. Davido suffered a heart attack that left him disabled from working. He applied with Motion Control for a disability pension, and he actually began receiving benefits. He was subsequently verbally informed by Norm Tarbell that he had mistakenly received the benefits, and those benefits were discontinued. I am no aware of any actual determination sent o Mr. Davido regarding the decision to discontinue. He informs me that he was told by Mr. Tarbell that he was not eligible for a disability pension because he was not actively employed with motion Control at the time he became disabled.

I am aware that there are other individuals in similar circumstances with each of my clients. In other words, there is at least one other person who began receiving benefits and then saw those benefits discontinued (similar to Mr. Davido), and there are others who became disabled and then were verbally informed by the Company that they were not eligible for disability pension benefits (similar to Mr. Rockwell). However, to date I have not been retained by any of those individuals, although I expect that will change in the near future.

In view of the information set forth above, would you kindly review this matter with your client. I have two questions. First, will Motion Control reconsider the decision to deny disability pension benefits to either or both of these two individuals based on the information set forth above? Second, in the event the Company is unwilling to alter its position, will the Company require these two individuals to bring administrative claims before pursuing a remedy in federal court under ERISA? Both individuals have authorized me to proceed in the most appropriate venue. If the Company wants these cases addressed in the first instance through the administrative process, then I will submit claims for both clients. If the Company were willing to agree that pursuit of the administrative process at this stage (given the apparent number of individuals in the same situations as these two claimants) would be futile, then I would proceed directly with an ERISA lawsuit of their behalf.

Exhibit 5

Richard W. Perhacs, Esquire
Page 3
March 23, 2004


I will wait to hear from you on this matter.

                              Very truly yours,



                              Robert A. Eberle

RAE:dmc

cc: Terry K. Rockwell
    Donald A. Davido, Jr.
    Edward J. Greenawalt, Local 502
    Larry Donachy

Exhibit 5



**KNOX
McLAUGHLIN
GORNALL
& SENNETT**

*A Professional Corporation*

120 West Tenth Street
Erie, Pennsylvania 16501-1461
814-459-2800
Fax 814-453-4530
www.kmgslaw.com

Richard W. Perhacs
rperhacs@kmgslaw.com

April 20, 2004

WILLIAM C. SENNETT
EDWIN L.R. McKEAN
RICHARD H. ZAMBOLDI
JACK M. GORNALL
HARRY K. THOMAS
MICHAEL A. FETZNER
JAMES T. MARNEN
DONALD E. WRIGHT, JR.
RICHARD W. PERHACS
ROBERT G. DWYER
R. PERRIN BAKER
MARK E. MODUSZEWSKI
CARL M. MOORE
DAVID M. MOSIER
THOMAS A. TUPITZA
GUY C. FUSTINE
RICHARD E. BORDONARO
BRIAN GLOWACKI
JOHN C. DODICK
FRANCIS J. KLEMENSIC
TIMOTHY M. SENNETT
WILLIAM C. WAGNER
PATRICIA K. SMITH
MARK T. WASSELL
RICHARD A. LANZILLO
JOANNA K. BUDDE
PETER A. PENTZ
MARK G. CLAYPOOL
THOMAS C. HOFFMAN III
MARK J. KUHAR
CHRISTOPHER J. SINNOTT
TIMOTHY M. ZIEZIULA
JENNIFER E. GORNALL-ROUCH
MARK A. DENLINGER
JEROME C. WEGLEY
TRACEY D. JONES
CRAIG W. SNETHEN
JAMES M. NADZAM

Robert A. Eberle, Esq.
219 Fort Pitt Blvd.
Pittsburgh, PA  15222-1576

RE:   **Terry K. Rockwell and Donald A. Davido, Jr. and
Motion Control Industries, Inc.**

Dear Bob:

This responds to your letter of March 23rd regarding the claims of the above former employees for disability pension benefits.

I enclose for your information a copy of a letter which Mr. Davido received from the Company in August, 2003 explaining in detail why his claim for disability pension benefits was denied. You will recall that Mr. Davido actually received these benefits for a brief period of time. As the letter explains, this payment was made in error and, since the mistake was on the Company's part, he was not asked to repay any of the amount erroneously paid to him. Mr. Rockwell's situation is identical, i.e., the disability began well after employment ended. The plant was closed and all employees terminated on March 16, 2002. As your letter recites, both of these individuals became disabled in May, 2002, almost two months after their employment ended.

I also enclose for your information a copy of the relevant portion of the pension plan. As you can see, Section 4.3(a) clearly provides that employment must terminate "because of a disability." In this case the employment of your clients, along with the employment of everyone else in the plant, terminated well before the disabilities arose. In light of the language of the plan, which seems rather clear, the Company will not reconsider its position in this matter.

Exhibit 6

Robert A. Eberle, Esq.
April 20, 2004
Page 2


     I do not have authorization to waive any requirement that administrative claims be filed, so, if your clients are insistent on pursuing this despite the above information, you should proceed accordingly.

          Very truly yours,

          KNOX McLAUGHLIN GORNALL &
          SENNETT, P.C.

          Richard W. Perhacs

RWP/smb
Enclosures
#547867

cc:  Norman Tarbell
     Michael L. Roberson, Esq.

Exhibit 6



**MOTION CONTROL INDUSTRIES**
4040 Lewis & Clark Dr.
Charlottesville, VA 22911
434-975-6028  800-840-5635  FAX: 434-975-7939

August 7, 2003

Mr. Don Davido
243 Ash Street
Ridgway, PA 15853

Dear Don,

I am writing to you regarding your eligibility for a Disability Retirement as a participant in the "Carlisle Corporation Retirement Plan for Hourly Paid Employees" of the Ridgway Local Union No. 502. According to a recent review of the Plan, to qualify for a Disability Retirement, an employee must meet the following criteria:

- The Participant must have ten years of vesting service, and
- The Participant must have a total and permanent disability which enables the participant to be eligible for and receiving Social Security disability benefits, and
- The Participant's termination must have been because of the disability.

The Ridgway facility was permanently closed on March 16, 2002. To qualify for a Disability Retirement, an employee had to have met the above criteria and retired before the date the facility closed. Because your disability was determined effective after March 16, 2002, you do not meet the criteria for a Disability Retirement.

As a result of the recent audit and review of our Plan administration, it was determined that an error was made in determining your eligibility for a Disability Retirement. As a result of our mistake, we will not require you to repay any of the monies already paid to you. There will, however, not be any additional payments until you retire under one of the other Plan options. At that time, you will be eligible for the full and appropriate benefit without any adjustment for the monies we have already paid to you.

We regret any inconvenience this may have caused.

Please feel free to contact me regarding your other options.

Respectfully submitted,

Norman E. Tarbell, Jr.
Division HR Manager
Carlisle Motion Control Industries, Inc.

Exhibit 6

05 23 02  THU 10 00 FAX 18477717907        ONE OP FIVE S                    ☑003

of his termination of Vesting Service, but shall be reduced, for the earlier date at which such benefit payments actually begin prior to the Member's Normal Retirement Age, in accordance with the early commencement provisions specified in the Supplement.

(c)     **Commencement and Duration.** Monthly early retirement benefit payments shall begin as of the retired Member's Early Retirement Date, unless he elects to have them begin on the first day of any calendar month thereafter but not later than the first of the month coincident with or next following his Normal Retirement Age. When monthly payments begin, they shall be paid monthly thereafter as of the first day of each succeeding month during his lifetime, subject to the optional forms of payment in sections 4.7 and 4.8 and the reemployment provisions in section 4.10.

## 4.3 Disability Retirement Benefits

(a)     **Eligibility.** If the employment of a Participant, but not an Inactive Participant, terminates (prior to retirement under section 4.1, 4.2, or 4.4) because of a Disability after he attains his Disability Retirement Age, he shall be eligible to receive a disability retirement benefit under the Plan, in accordance with and subject to the provisions of the Plan.

(b)     **Amount.** The monthly disability retirement benefit payable to a Participant eligible therefor under (a) above shall be an amount computed in the same manner as a normal retirement benefit under section 4.1(b), based on his Credited Service at the time of his Disability, without reduction for commencement prior to his Normal Retirement Age.

Or, the monthly amount of a Participant's disability retirement benefit, if any, shall be determined as provided in the Supplement.

(c)     **Commencement and Duration.** Monthly disability retirement benefits shall begin as of the Participant's Disability Retirement Date. When monthly payments begin, they shall be payable monthly thereafter as of the first day of each succeeding month during his lifetime, subject to the optional forms of payment in sections 4.7 and 4.8, and provided further that—

(1)     If such Participant's Disability ceases prior to his Normal Retirement Age or if he ceases to receive disability benefits under the Social Security Act, he shall lose his eligibility for benefits under this section 4.3. If he resumes employment with the Employer as an Hourly Employee promptly after such cessation, he shall again accumulate benefits as a Participant, and after his reemployment ceases, he may be eligible for a normal, early, or deferred vested retirement benefit under the Plan.

Exhibit 6

LAW OFFICES

## JUBELIRER, PASS & INTRIERI, P.C.

219 FORT PITT BOULEVARD

PITTSBURGH, PENNSYLVANIA 15222-1576

412-281-3850
412-261-0147

JOSEPH J. PASS
NEAL R. CRAMER
ERNEST B. ORSATTI
EDWARD H. WALTER
ROBERT A. EBERLE
JAMES A. WELKER
JASON METTLEY
JOSEPH SANTINO PASS

BEN PAUL JUBELIRER (1904-1983)
FRANK P. C. INTRIERI (1942-1976)

FAX. 412-281-1985

May 24, 2004

Richard W. Perhacs, Esquire
Knox, McLaughlin, Gornall & Sennett
120 W. 10th Street
Erie, PA 16501-1461

      Re:   Donald A. Davido, Jr., Terry K. Rockwell, James E. Clark,
              Henry M. Hearne, William F. Lunder, Paul L. Plyler,
              Lynn A. Rhodes and Glenn H. Olay
              Disability Pension Claims With Motion Control Industries

Dear Rich:

      I received your letter dated April 20, 2004, in response to my letter of March 23, 2004, regarding Don Davido and Terry Rockwell. I have been contacted by the other individuals listed above because they also have claims for disability pensions with Motion Control. Although their individual circumstances vary somewhat, the common thread is that each individual has been informed by the Pension Plan Administrator's office that they do not qualify for a disability pension benefit because they were not actively working for Motion Control at the time the disability claim arose. This is the same basis asserted in the cases of Davido and Rockwell.

      After I received your letter of April 20, 2004, I instructed Davido and Rockwell to once again request an application for benefits. Rockwell informed me that he contacted the Plan Administrator's office on Monday, May 17, 2004, and they refused once again to provide him with an application for benefits. I am bringing this to your attention because there does not seem to be any reason to believe that further efforts to exhaust the administrative process are warranted. If there is something further that can be done, I am asking you to advise what that next step would be. Please note that whatever would be the next step, the other individuals listed above will also pursue that step. If you require information regarding the circumstances surrounding the claims of the other individuals, please let me know and I will forward that information to you immediately.

Exhibit 7

Richard W. Perhacs, Esquire
Page 2
May 24, 2004

Your attention to this matter will be greatly appreciated.

Very truly yours,

Robert A. Eberle

RAE:dmc

cc: Donald A. Davido, Jr.
    Terry K. Rockwell
    James E. Clark
    Henry M. Hearne
    William F. Lunder
    Paul L. Plyler
    Lynn A. Rhodes
    Glenn H. Olay
    Larry Donachy
    Edward Greenawalt

Exhibit 7

M7

# Social Security Administration
## Retirement, Survivors, and Disability Insurance
Notice of Award



Office of Central
Operations
1500 Woodlawn Drive
Baltimore, Maryland 21241-1500
Date: March 12, 2004
Claim Number: 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 HA

GLENN H OLAY
3594 GRANT RD
RIDGWAY, PA  15853

Ioilldldldidolldldldldldldolldoldolddlal

You are entitled to monthly disability benefits beginning
July 2002.

**The Date You Became Disabled**

We found that you became disabled under our rules on
January 11, 2002.

However, you have to be disabled for 5 full calendar months in
a row before you can be entitled to benefits.  For these
reasons, your first month of entitlement to benefits is
July 2002.

**What We Will Pay And When**

- You will receive $4,176.00 around March 14, 2004.

- This is the money you are due for July 2002 through
  February 2004.

Your next payment of $305.00, which is for March 2004, will be
received on or about the third Wednesday of April 2004.

- After that you will receive $305.00 on or about the third
  Wednesday of each month.

The day we make payments on this record is based on your date
of birth.

**Your Benefits**

The following chart shows your benefit amount(s) before any
deductions or rounding.  The amount you actually receive(s) may
differ from your full benefit amount.  When we figure how much
to pay you, we must deduct certain amounts, such as Medicare
premiums.  We must also round down to the nearest dollar.

SEE NEXT PAGE
Exhibit 8

# Social Security Administration
Case 1:04-cv-00276-MBC    Document 21-3    Filed 03/30/2006    Page 1 of 3
# Retirement, Survivors and Disability Insurance
## Notice of Award

Mid-America Program Service Center
601 East Twelfth Street
Kansas City, Missouri 64106-2859
Date:  November 3, 2002
Claim Number:  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HA

HENRY M HEARNE
HC 06 BOX 99
BROOKVILLE, PA 15825-7703

You are entitled to monthly disability benefits beginning October 2002.

**The Date You Became Disabled**

We found that you became disabled under our rules on April 10, 2002.  This is different from the date given on the application.

Also, you have to be disabled for 5 full calendar months in a row before you can be entitled to benefits.  For these reasons, your first month of entitlement to benefits is October 2002.

**What We Will Pay And When**

- You will receive $1,319.00 around November 9, 2002.

- This is the money you are due for October 2002.

- Your next payment of $1,319.00, which is for November 2002, will be received on or about the third Wednesday of December 2002.

- After that you will receive $1,319.00 on or about the third Wednesday of each month.

The day we make payments on this record is based on your date of birth.

**Other Social Security Benefits**

The benefit described in this letter is the only one you can receive from Social Security.  If you think that you might qualify for another kind of Social Security benefit in the future, you will have to file another application.

Enclosure(s):
Pub 05-10153
Pub 05-10058

C                          See Next Page

Exhibit 8

EXHIBIT

D

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HA                                        Page 2 of 3

## Your Responsibilities

The decisions we made on your claim are based on information you gave us. If this information changes, it could affect your benefits. For this reason, it is important that you report changes to us right away.

We have enclosed a pamphlet, "When You Get Social Security Disability Benefits...What You Need To Know." It will tell you what must be reported and how to report. Please be sure to read the parts of the pamphlet which explain what to do if you go to work or if your health improves.

A state or other public or private vocational rehabilitation provider may contact you to talk about their services. The rehabilitation provider may offer you counseling, training, and other services that may help you go to work. To keep getting disability benefits, you have to accept the services offered unless we decide you have a good reason for not accepting.

You do not have to wait to be contacted about vocational rehabilitation services. You can contact the nearest state vocational rehabilitation office directly and let them know that you are interested in receiving services.

If you go to work, special rules can allow us to continue your cash payments and health insurance coverage. For more information about how work and earnings may affect disability benefits, you may call or visit any Social Security office. You may wish to ask for any of the following publications:

- Social Security - Working While Disabled...How We Can Help (SSA Publication No. 05-10095).

- Social Security - If You Are Blind--How We Can Help (SSA Publication No. 05-10052).

- How Social Security Can Help With Vocational Rehabilitation (SSA Publication No. 05-10050).

## Do You Disagree With The Decision?

If you disagree with this decision, you have the right to appeal. We will review your case and consider any new facts you have. A person who did not make the first decision will decide your case. We will correct any mistakes. We will review those parts of the decision which you believe are wrong and will look at any new facts you have. We may also review those parts which you believe are correct and may make them unfavorable or less favorable to you.

- You have 60 days to ask for an appeal.

- The 60 days start the day after you get this letter. We assume you got this letter 5 days after the date on it unless you show us that you did not get it within the 5-day period.

- You must have a good reason for waiting more than 60 days to ask for an appeal.

Exhibit 8

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HA                                    Page  3 of  3

- You have to ask for an appeal in writing.  We will ask you to sign a Form SSA-561-U2, called "Request for Reconsideration".  Contact one of our offices if you want help.

Please read the enclosed pamphlet, "Your Right to Question the Decision Made on Your Social Security Claim".  It contains more information about the appeal.

**If You Want Help With Your Appeal**

You can have a friend, lawyer or someone else help you.  There are groups that can help you find a lawyer or give you free legal services if you qualify.  There are also lawyers who do not charge unless you win your appeal.  Your local Social Security office has a list of groups that can help you with your appeal.

If you get someone to help you, you should let us know.  If you hire someone, we must approve the fee before he or she can collect it.  And if you hire a lawyer, we will withhold up to 25 percent of any past due benefits to pay toward the fee.

**If You Have Any Questions**

We invite you to visit our website at www.ssa.gov on the Internet to find general information about Social Security.  If you have any specific questions, you may call us toll-free at 1-800-772-1213, or call your local Social Security office at 1-814-371-8099.  We can answer most questions over the phone.  If you are deaf or hard of hearing, you may call our TTY number, 1-800-325-0778.  You can also write or visit any Social Security office.  The office that serves your area is located at:

SOCIAL SECURITY
480 JEFFERS STREET
DUBOIS, PA 15801

If you do call or visit an office, please have this letter with you.  It will help us answer your questions.  Also, if you plan to visit an office, you may call ahead to make an appointment.  This will help us serve you more quickly when you arrive at the office.

Jo Anne B. Barnhart
Commissioner
of Social Security

Exhibit 8

# Social Security Administration
# Retirement, Survivors and Disability Insurance
## Notice of Award

Office of Central Operations
1500 Woodlawn Drive
Baltimore, Maryland 21241-1500
Date: February 18, 2003
Claim Number: 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HA

PAUL L PLYLER
415 N BROAD ST
RIDGWAY, PA 15853

You are entitled to monthly disability benefits beginning December 2002.

**The Date You Became Disabled**

We found that you became disabled under our rules on June 24, 2002.

However, you have to be disabled for 5 full calendar months in a row before you can be entitled to benefits. For these reasons, your first month of entitlement to benefits is December 2002.

**What We Will Pay And When**

- You will receive $520.50 around February 24, 2003.

- This is the money you are due for December 2002 and January 2003.

- Your next payment of $347.00, which is for February 2003, will be received on or about the third of March 2003.

- After that you will receive $347.00 on or about the third of each month.

**Other Disability Payments Affect Benefits**

We have to consider workers' compensation and/or public disability payments when we figure a Social Security benefit. The following will explain how these payments affect Social Security benefits. For more information, please read the enclosed pamphlet, "How Workers' Compensation and Other Disability Payments May Affect Your Social Security Benefit."

The pamphlet explains how we reduce your and your family's Social Security disability checks if the money which you and your family would receive from Social Security and workers' compensation payments adds up to more than 80 percent of your monthly average current earnings. We found that 80 percent of your average current earnings is $2,319.20.

See Next Page

Exhibit 8

# Social Security Administration
## Retirement, Survivors and Disability Insurance
Notice of Award

Office of Central Operations
1500 Woodlawn Drive
Baltimore, Maryland 21241-1500
Date:  May 27, 2003
Claim Number:  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HA

R22 MC2,PC7,1,8A,T122,153                         860012665 02 M/R     0.534
WILLIAM F LUNDER
707 OKNEFSKI RD
RIDGWAY, PA 15853-7043

You are entitled to monthly disability benefits beginning September 2003.

**The Date You Became Disabled**

We found that you became disabled under our rules on March 31, 2003.  This is
different from the date given on the application.

Also, you have to be disabled for 5 full calendar months in a row before you can
be entitled to benefits.  For these reasons, your first month of entitlement to
benefits is September 2003.

**What We Will Pay And When**

- You will receive $1,556.00 for September 2003 around October 8, 2003.

- After that you will receive $1,556.00 on or about the second Wednesday of
  each month.

- These and any future payments will go to the financial institution you
  selected.  Please let us know if you change your mailing address, so we can
  send you letters directly.

The day we make payments on this record is based on your date of birth.

**Other Social Security Benefits**

The benefit described in this letter is the only one you can receive from Social
Security.  If you think that you might qualify for another kind of Social Security
benefit in the future, you will have to file another application.

Enclosure(s):
Pub 05-10153

C                              **See Next Page**
                                  Exhibit 8

## Your Responsibilities

You are due disability benefits because you are expected to be disabled under our rules for at least 5 full calendar months. Therefore, you should let us know if your health improves or you are able to return to work.

The decisions we made on your claim are based on information you gave us. If this information changes, it could affect your benefits. For this reason, it is important that you report changes to us right away.

We have enclosed a pamphlet, "When You Get Social Security Disability Benefits...What You Need To Know." It will tell you what must be reported and how to report. Please be sure to read the parts of the pamphlet which explain what to do if you go to work or if your health improves.

A provider of employment or vocational rehabilitation services may contact you about getting help to go to work. The provider may be a State vocational rehabilitation agency or a provider under contract with the Social Security Administration.

If you go to work, special rules allow us to continue your cash payments and health care coverage. For more information about how work and earnings affect disability benefits, call or visit any Social Security office and ask for the following publications:

- Social Security - Working While Disabled...How We Can Help (SSA Publication No. 05-10095).

- Social Security - If You Are Blind--How We Can Help (SSA Publication No. 05-10052).

## If You Disagree With The Decisions

If you disagree with the decisions, you have the right to appeal. A person who did not make the first decision will decide your case. We will review those parts of the decisions you disagree with and will look at any new facts you have. We may also review those parts of the case that you believe are correct and may make them unfavorable or less favorable to you.

## About The Appeals

If you disagree with the nonmedical decisions we made on your case, the appeal is called a reconsideration. Some examples of nonmedical decisions are the amount of your payment, and the month your payment starts. You will not meet with the person who decides your case.

If you disagree with the disability (medical) decision made by the state, the appeal is called a hearing. Some examples of medical decisions are the date your disability started or whether you are still disabled.

Exhibit 8

### If You Want To Appeal

- You have 60 days to ask for an appeal.

- The 60 days start the day after you receive this letter.  We assume you got this letter 5 days after the date on it unless you show us that you did not get it within the 5-day period.

- You must have a good reason if you wait more than 60 days to ask for an appeal.

- You have to ask for an appeal in writing.  We will ask you to sign a form SSA-561-U2, called "Request for Reconsideration," or a form HA-501, called "Request for Hearing."  Contact one of our offices if you want help.

### If You Ask For A Reconsideration And A Hearing

If you ask for both a reconsideration and a hearing, we will process the hearing first, even if you made the reconsideration request first.  When we make our decisions, we will send you letters explaining our decisions on both the reconsideration and the hearing.

### How The Hearing Process Works

After we send your case for a hearing, an Administrative Law Judge (ALJ) will mail you a letter at least 20 days before the hearing to tell you its date, time and place.  The letter will explain the law in your case and tell you what has to be decided.  Since the ALJ will review all the facts in your case, it is important that you give us any new facts as soon as you can.

The hearing is your chance to tell the ALJ why you disagree with the decisions in your case.  You can give the ALJ new evidence and bring people to testify for you.  The ALJ also can require people to bring important papers to your hearing and give facts about your case.  You can question these people at your hearing.

### It Is Important To Go To The Hearing

It is very important that you go to the hearing.  If for any reason you can't go, contact the ALJ as soon as possible before the hearing and explain why.  The ALJ will reschedule the hearing if you have a good reason.

If you don't go to the hearing and don't have a good reason for not going, the ALJ may dismiss your request for a hearing.

### Things To Remember For The Future

We decided that you are disabled under our rules.  However, we must review all disability cases.  Therefore, we will review your case in 5 to 7 years.  We will send you a letter before we start the review.  Based on that review, your benefits will continue if you are still disabled, but will end if you are no longer disabled.



Exhibit 8

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HA                                        Page  4 of  4

**If You Have Any Questions**

We invite you to visit our website at www.socialsecurity.gov on the Internet to
find general information about Social Security. If you have any specific
questions, you may call us toll-free at 1-800-772-1213, or call your local Social
Security office at 1-814-371-8099. We can answer most questions over the
phone. If you are deaf or hard of hearing, you may call our TTY number,
1-800-325-0778. You can also write or visit any Social Security office. The office
that serves your area is located at:

>           SOCIAL SECURITY
>           480 JEFFERS STREET
>           DUBOIS, PA 15801


If you do call or visit an office, please have this letter with you. It will help us
answer your questions. Also, if you plan to visit an office, you may call ahead to
make an appointment. This will help us serve you more quickly when you arrive
at the office.


>           *Jo Anne B. Barnhart*
>
>           Jo Anne B. Barnhart
>           Commissioner
>           of Social Security

Exhibit 8

William F. Lunder                                                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

## NOTICE OF DETERMINATION

The following reports were used to decide the claim.

1.    Guillermo G. Udarbe, M.D., report received 5/14/03
2.    Dickinson Mental Health Center, report received 5/8/03

He said that he first became disabled February 28, 2002 due to back pain, rotator cuff
injury, angina and a panic disorder.

We are establishing his onset for disability as of March 21, 2003.  This is the day after
the Administrative Law Judge's last decision and the day his condition first met the
criteria for disability.

We have therefore concluded that his disability began on March 21, 2003.

Exhibit 8

Social Security Administration
# Retirement, Survivors, and Disability Insurance
Notice of Award

REC'D 15 JAN 03

Office of Central
Operations
1500 Woodlawn Drive
Baltimore, Maryland 21241-1500
Date: September 4, 2003
Claim Number: 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 HA

LYNN A RHODES
406 N BROAD ST
RIDGWAY, PA  15853

You are entitled to monthly disability benefits beginning
July 2002.

**The Date You Became Disabled**

We found that you became disabled under our rules on
January 11, 2002.

However, you have to be disabled for 5 full calendar months in
a row before you can be entitled to benefits.  For these
reasons, your first month of entitlement to benefits is
**July 2002.**

**What We Will Pay And When**

- You will receive $989.00 for August 2003 around
  September 10, 2003.

- After that you will receive $989.00 on or about the second
  Wednesday of each month.

- These and any future payments will go to the financial
  institution you selected.  Please let us know if you change
  your mailing address, so we can send you letters directly.

The day we make payments on this record is based on your date
of birth.

**Your Benefits**

The following chart shows your benefit amount(s) before any
deductions or rounding.  The amount you actually receive(s) may
differ from your full benefit amount.  When we figure how much
to pay you, we must deduct certain amounts, such as Medicare
premiums.  We must also round down to the nearest dollar.

SEE NEXT PAGE

Exhibit 8

**SOCIAL SECURITY ADMINISTRATION**
**Office of Hearings and Appeals**

**DECISION**

<table>
<tr><td><u><strong>IN THE CASE OF</strong></u></td><td><u><strong>CLAIM FOR</strong></u></td></tr>
<tr><td></td><td>Period of Disability and<br>Disability Insurance Benefits</td></tr>
<tr><td>Lynn A. Rhodes<br>(Claimant)</td><td></td></tr>
<tr><td>(Wage Earner)</td><td>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<br>(Social Security Number)</td></tr>
</table>

## PROCEDURAL HISTORY

This case is before the Administrative Law Judge on a request for a hearing filed by the claimant, who is dissatisfied with the previous determination finding that she is not disabled. The claimant filed a Title II application for disability insurance benefits on August 16, 2002 (protective filing date), alleging disability since January 11, 2002. After a proper notice, a hearing was held on July 7, 2003, in DuBois, Pennsylvania. The claimant personally appeared and testified, represented by Joseph H. Ellermeyer, an attorney. Also testifying was a vocational expert.

## ISSUES

The issues in this case are whether the claimant is under a disability as defined by the Social Security Act and if so, when the disability commenced, and the duration of the disability. An additional issue is whether the insured status requirements of the Act are met for the purpose of entitlement to a period of disability and disability insurance benefits.

## EVALUATION OF THE EVIDENCE

After a thorough evaluation of the entire record, the Administrative Law Judge concludes that the claimant has been disabled since January 11, 2002. The claimant met the insured status requirements of the Social Security Act through December 31, 2007. The claimant has not engaged in any substantial gainful activity since the disability onset date. The claimant has the following impairments which are considered to be "severe" under Social Security Regulations: degenerative disc disease of the cervical spine, status post two surgical procedures, with right hand tremor; and, diabetes mellitus.

Exhibit 8

Lynn A. Rhodes (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)                                    Page 2 of 5

Although the claimant has impairments which are considered to be "severe," they are not attended, singly or in combination, with the specific clinical signs and diagnostic findings required to meet or equal the requirements set forth in the Listing of Impairments. Appendix 1 to Subpart P, 20 C.F. R. Part 404.

A determination in this case cannot be based on medical considerations alone. Therefore, it is necessary to proceed to steps four and five of the sequential evaluation. Steps four and five require a determination of whether the claimant has, during the time at issue, retained the residual functional capacity to perform past relevant work, and if not, to perform other work existing in significant numbers in the national economy consistent with the claimant's age, education and past work experience. In order to make these determinations, it is necessary to assess the claimant's mental and physical residual functional capacity. Residual functional capacity is what the claimant can still do despite limitations due to the impairments. The claimant has the residual functional capacity to do the following: no work, even sedentary work, on a regular and continuing basis because of the need for frequent breaks, absences, and lapses in concentration because of pain, discomfort, tremors, and lapses in concentration.

The claimant complains of pain, discomfort, and tremors from her musculoskeletal impairments to such an extent that she cannot perform any work, even sedentary work, on a regular and continuing basis because of the need for frequent breaks, absences, and lapses in concentration.

The claimant's course of treatment and the objective findings support her subjective allegations. The claimant has had two surgeries on her neck because of severe spondylolytic changes--first, an anterior cervical discectomy with bony fusion at C4-5 and C5-6, and, then a C3 through C7 laminoplasty. Despite these surgeries, treatment notes from the orthopedic surgeon show that the claimant still experiences marked reduction in her neck range of motion, weakness, tremors, and sensory loss in her right upper extremity, and headaches. The treatment notes from physical therapy following her recent surgery show that she has not made any progress in connection with her symptoms. The claimant is prescribed the potent pain analgesic, Vicodin, and also the medication, Neurontin, in connection with her pain and tremors.

The claimant's primary care physician reports that the claimant is incapacitated and unable to work because of severe neck pain, which also supports the claimant's subjective allegations, and is consistent with the evidence discussed above.

Finally, the claimant's reduced range of daily activities, and her long and successful work history, also supports her subjective allegations.

This conclusion is supported by the opinion of the treating source, Exhibit 17F; the medical signs and findings, Exhibits 2F-5F, 8F-10F, 12F-18F; the claimant's significant medical treatment history, Exhibits 2F-5F, 8F-10F, 12F-19F; the claimant's daily activities which are substantially restricted, Exhibit 3E; and, the claimant's long and successful work history, Exhibit 4D.

In accordance with Social Security Ruling 96-6p, the Administrative Law Judge has considered the administrative findings of fact made by the State agency medical physicians and other consultants. These opinions are weighed as statements from nonexamining expert sources. New

Exhibit 8

medical evidence from the treating source is given more weight than the State agency opinions. The State agency did not adequately consider the entire record, including the subjective complaints and other allegations of the claimant.

The claimant's description of her limitations is consistent with the record when considered in its entirety. The claimant cannot perform her past relevant work as an industrial laborer, which ranged from light to heavy in exertion and was unskilled in nature.

Since the claimant cannot perform past relevant work, the burden shifts to the Commissioner to show that there are other jobs existing in significant numbers that the claimant can perform, consistent with the medically determinable impairments, age, education, and work experience. The claimant was 48 years old (younger individual, 45 - 49) on the date her disability began. The claimant has a high school education. Considering the claimant's residual functional capacity and vocational factors, the issue of transferability of skills is not material in this decision.

Residual functional capacity is the claimant's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week or an equivalent work schedule. Social Security Ruling 96-8p. The claimant must have both the mental and physical abilities to perform sustained work activities. Because the evidence supports a finding that the claimant has had a substantial loss of ability to meet the demands of basic work related activities on a sustained basis, the unskilled sedentary occupational base is significantly eroded and a finding of disability is justified under Social Security Ruling 96-9p. The Commissioner has promulgated medical-vocational rules found in Appendix 2, Subpart P, Social Security Regulations No. 4 which take into account the claimant's age, education, work experience and residual functional capacity. The claimant's medical-vocational profile most closely parallels Rules 201.18 and 201.21 of the Medical-Vocational Guidelines, which direct a conclusion that the claimant is "not disabled" within the meaning of the Social Security Act. However, due to the nonexertional factors that may erode the job base which the claimant is able to perform, the medical-vocational rules cannot be used to direct a finding. However, they may be used as a framework for making a decision. The claimant's capacity for the full range of work has been significantly compromised by her nonexertional limitations. Therefore, using the framework of Medical-Vocational Rules 201.18 and 201.21, Appendix 2, Subpart P, Regulations No. 4, the Administrative Law Judge finds that significant numbers of jobs do not exist in the national economy which the claimant is capable of performing. The claimant is disabled within the meaning of the Social Security Act and Regulations.

Exhibit 8

Lynn A. Rhodes (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)                                         Page 4 of 5

## FINDINGS

After consideration of the entire record, the Administrative Law Judge makes the following findings:

1.   The claimant has not engaged in any substantial gainful activity since the disability onset date.

2.   The claimant's impairments which are considered to be "severe" under the Social Security Act are as follows: degenerative disc disease of the cervical spine, status post two surgical procedures, with right hand tremor; and, diabetes mellitus.

3.   The claimant's impairments do not, singly or in combination, meet or equal in severity the appropriate medical findings contained in 20 CFR Part 404, Appendix 1 to Subpart P (Listing of Impairments).

4.   The claimant's allegations are credible.

5.   The claimant has the residual functional capacity to do the following:  no work, even sedentary work, on a regular and continuing basis because of the need for frequent breaks, absences, and lapses in concentration because of pain, discomfort, and tremors

6.   The claimant is unable to perform her past relevant work.

7.   The claimant was 48 years old (younger individual, 45 - 49) on the date her disability began.  The claimant has a high school education.

8.   Considering the claimant's residual functional capacity and vocational factors, the issue of transferability of skills is not material in this decision.

9.   Based upon the claimant's residual functional capacity, and vocational factors, there are no jobs existing in significant numbers which she can perform.  This finding is based upon the following:  Social Security Ruling 96-9p, the framework of medical - vocational rules 201.18 and 201.21.

10.   The claimant met the disability insured status requirements of the Social Security Act on the date disability began, and through December 31, 2007.

11.   The claimant has been under a disability as defined by the Social Security Act and Regulations since January 11, 2002, and her disability has lasted at least through the date of this decision.

Exhibit 8

Lynn A. Rhodes (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)                                    Page 5 of 5

## DECISION

Based on the Title II application filed on August 16, 2002 (protective filing date), the claimant is entitled to a period of disability beginning January 11, 2002 and to disability insurance benefits under Sections 216(i) and 223, respectively, of the Social Security Act.


_____
Raymond J. Zadzilko
Administrative Law Judge


_____
Date

Exhibit 8

## LIST OF EXHIBITS

**Claimant:**   **Lynn A. Rhodes**                                    **SSN:**   **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**

| Exh. No. | Part No. | Description | No. of Pages |
|---|---|---|---|
| | | | |
| | | **MEDICAL RECORDS** | |
| 1 | F | Medical Report dated 4/19/2001 from Robert D. Baker, MS,PT,ECS,OCS | 2 |
| 2 | F | Hospital Records for pre-admission dated 5/31/2001, 6/4/2001 and admission on 6/18/2001 *through discharge on 6/19/2001 from Elk Regional Health Center* | 59 |
| 3 | F | Medical Records covering the period from 8/7/2001 to 2/25/2002 from Elk Regional Health Center | 34 |
| 4 | F | Medical Records covering the period from 1/29/2002 to 2/26/2002 from Robert J. Schmidt, MD | 14 |
| 5 | F | Medical Records covering the period from 2/3/1999 to 4/3/2002 from David H. Johe, MD (Submitted by REP) (duplicates removed) | 91 |
| 6 | F | Medical Records covering the period from 2/4/1999 to 4/4/2002 from David H. Johe, MD | 31 |
| 7 | F | Medical Report dated 4/10/2002 from Alexander A. Krot, DO (Submitted by Representative) | 1 |
| 8 | F | Treatment Records covering period from 2/7/2002 to 7/12/2002 from Lynn Myers, MD | 14 |
| 9 | F | Outpatient Medical Records covering period from 3/3/1996 to 8/2/2002 from Elk Regional Medical Center | 28 |
| 10 | F | Progress notes covering the period from 7/9/2002 to 10/15/2002 by William F. Donaldson, III, MD | 7 |
| 11 | F | RFC - Residual Functional Capacity Assessment - Physical (completed by DDS physician) dated 11/14/2002 | 8 |
| 12 | F | Medical Report Follow Up dated 12/17/2002 from William F. Donaldson, III, MD (submitted by Representative) | 3 |

Exhibit 8

## LIST OF EXHIBITS

Claimant:    Lynn A. Rhodes                                  SSN:    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

| Exh. No. | Part No. | Description | No. of Pages |
|---|---|---|---|
| 13 | F | Radiology Reports dated 4/17/01 and 4/21/03 from Elk Regional Health Center (submitted by Attorney) | 3 |
| 14 | F | Progress notes dated 03/11/03 and 05/07/03 from William F. Donaldson, III, M.D. (submitted by Attorney) | 2 |
| 15 | F | Imaging Consultation dated 03/11/03 from UPMC Health System, William F. Donaldson, III, M.D. | 1 |
| 16 | F | Radiology Report dated 04/21/03 from Elk Regional Health Center | 2 |

### RECEIVED DURING HEARING

| | | | |
|---|---|---|---|
| 17 | F | Medical Statement dated 07/03/03 with attached Medical Records covering the period 02/14/03 to 04/22/03 from Robert J. Schmidt, M.D. | 3 |
| 18 | F | Physical Therapy Records covering the period 03/14/03 to 04/22/03 from Elk Regional Health Center | 13 |
| 19 | F | Medical Report dated 07/07/03 with attached Audiologic Evaluation dated 10/30/96 from Richard W. Foust, M.Ed. CCC-A | 2 |

Exhibit 8



**MOTION CONTROL INDUSTRIES, INC.**
4040 Lewis and Clark Drive
Charlottesville, VA 22911
804-975-6028  800-840-5635  FAX: 804-975-6127



August 7, 2003

Mr. Paul L. Plyler
417 North Broad Street
Ridgway, PA  15853

Dear Mr. Plyler,

I am writing to you regarding your request for a Disability Retirement as a participant in
the "Carlisle Corporation Retirement Plan for Hourly Paid Employees" of the Ridgway
Local Union No. 502. According to a recent review of the Plan, to qualify for a
Disability Retirement, an employee must meet the following criteria:

- The Participant must have ten years of vesting service, and
- The Participant must have a total and permanent disability which enables the
  participant to be eligible for and receiving Social Security disability benefits, and
- The Participant's termination must have been because of the disability.

The Ridgway facility was permanently closed on March 16, 2002. To qualify for a
Disability Retirement, an employee had to have met the above criteria and retired before
the date the facility closed. Because your disability was determined effective after March
16, 2002, you do not meet the criteria for a Disability Retirement.

If you choose, you may be eligible to retire under one of the other Plan options. Please
feel free to contact me regarding your other options.

Respectfully submitted,

Norman E. Tarbell, Jr.
Division HR Manager
Carlisle Motion Control Industries, Inc.

**A CARLISLE Company**                    Exhibit 9

IN THE MATTER OF ARBITRATION  )
  )
  )
MOTION CONTROL INDUSTRIES,  )
DIVISION OF CARLISLE CORPORATION )
  )
  )
    and    )    Grievance No. 41
  )
  )
LOCAL 502 AFFILIATED WITH  )
INTERNATIONAL UNION OF  )
ELECTRONIC, ELECTRICAL, SALARIED, )
MACHINE AND FURNITURE WORKERS, )
AFL-CIO  )

Richard W. Perhacs, Esq., for the Employer
Robert A. Eberle, Esq., for the Union
Before Matthew M. Franckiewicz, Arbitrator

## OPINION AND AWARD

This arbitration proceeding involves whether laid off employees were entitled to receive certain vacation pay benefits.

A hearing was held on March 11, 2003 at DuBois, Pennsylvania. Both parties called, examined and cross examined witnesses, and offered documentary evidence. Both parties filed briefs. The record closed with the exchange of briefs on June 16, 2003.

## Contract Provisions Involved

### PREAMBLE

(4)  In the event the Company's facility located in Ridgway, Pennsylvania, is shut down as a result of relocation of its friction materials operations, the Company agrees to negotiate in good faith with the Union all the benefits under the terms of this Agreement.

### ARTICLE 11
### VACATIONS

(150)  Section 1:  [Provisions on scheduling of vacation omitted.]

Exhibit 10

*  *  *

(153)    Up to two (2) weeks pay in lieu of time off may be taken. Such requests must be designated two (2) weeks in advance.

(154)    Section 2: Effective on Employee's hiring date, paid vacations will be granted as follows:   [Schedule omitted.]

(156)    Section 3: The anniversary date for computation of vacation payments will be calculated on the twelve (12) month period beginning with the employee's hiring date. All unused vacation will be paid on the following anniversary date in lieu of additional time off. Up to a maximum of two (2) days vacation in advance will be permitted if the employee's upcoming anniversary date falls within one (1) month of the requested advance vacation day.

(157)    Section 4: Vacations shall be paid at the employee's classified rate (including shift differential, if applicable).

(158)    (a)      Employees absent during the vacation will be considered as having continuous service.

(159)    Section 5: All Employees whose services are terminated for any cause whatsoever shall receive with their final pay their accumulated vacation hours.

*  *  *

(162)    Section 8: An employee who works less than a full twelve (12) months during his service year because of layoff for lack of work in line with his seniority, will have his vacation entitlement prorated in increments of 1/12th for each month worked (rounded up to the nearest full day) upon his return to active status. A one-month grace period will be allowed without any reduction in vacation entitlement. Vacation requests will only be denied if both the Company and Union mutually agree.

(163)    For the purpose of this Article, a full day's pay within any month shall count as a full month's vacation credit.

## The Facts

On January 11, 2002 the Company ceased operations at its Ridgway, Pennsylvania facility. It provided bargaining unit employees with WARN Act notice, and paid them pursuant to the provisions of the WARN Act through March 16, 2002. At the time of the shutdown there were approximately 126 bargaining unit employees, down from a peak of roughly 350 in the early 1980s. There are pending unresolved grievances alleging that the Company improperly failed to recall some of the employees after March 16, 2002.

- 2 -

Exhibit 10

On August 2, 2002, the Company paid the laid off employees their "earned" vacation pay, but it has taken the position that it is not obligated to pay "accrued" vacation pay, which is the subject of this arbitration.

As the parties use the term, on an employee's anniversary date he is credited with the appropriate number of vacation days as his "earned" vacation. He may use those days as paid vacation during the year between his most recent anniversary date and the following anniversary date, or may receive pay in lieu for some or all of the earned vacation days. During the period after his most recent anniversary date, the employee accumulates "accrued" vacation, essentially on a pro rata basis based on the number of months worked since his most recent anniversary date. On his next anniversary date, the accrued vacation becomes earned vacation.

As an example, an employee hired on July 1, 1985 would be credited with 20 earned vacation days on July 1, 2001. If he used 15 of those days during the remainder of calendar year 2001, he would have 5 days of earned vacation left as of December 31, 2001. He would also have 10 days of accrued vacation (6/12 x 20 days). The example assumes that the employee was actively working at all relevant times.

In 1992 the language in Section 8 of the Vacations article was added to the collective bargaining agreement. Prior to that time an employee who worked as little as one day during his vacation year was credited with the full vacation for his length of service. During the 1992 negotiations the parties agreed to establish a pro rata system. The Company did not propose eliminating accrued vacation for the period after an employee's most recent anniversary date.

Accounting Clerk Chris Amacher, who administered the vacation benefits and maintained the records, testified that whenever there was a change in the collective bargaining agreement, before implementing the change in the computer system, she made sure that both the Company and the Union were in agreement as to how the system should work.

When an employee's employment terminated for any reason, Amacher would obtain the amount of his earned vacation pay from the records, and calculate his accrued vacation pay. After the 1992 contract changes, when an employee was laid off, Amacher kept track of the amount of earned vacation pay to which the employee was entitled, and calculated his accrued vacation pay through the date of the layoff. Prior to 1994, the vacation pay process for laid off employees involved simply calculating the appropriate amount of earned and accrued vacation. Nothing was paid to the employee while on layoff, unless his employment terminated (for example if an employee resigned in order to accept other employment, as some other employers required them to do). A laid off employee who terminated his employment received a check for his earned and accrued vacation pay, in the same manner as an employee who quit, was discharged, or retired when not on layoff.

In approximately 1994, the Company established a new policy on the payment of vacation pay to employees on layoff, to which the Union had no objection. Prior to that time, disagreements arose as to how much of an employee's earned vacation had been used, and how much was still remaining. In order to eliminate such arguments, the Company began paying vacation pay to employees while on layoff. Under the new policy, on an employee's first anniversary date following the layoff, he was paid all his earned unused vacation. This vacation was "earned" as of the anniversary date immediately preceding the layoff. If the employee remained on layoff long enough to have a second anniversary date, he received another check for the accrued vacation, calculated on a pro rata basis from the anniversary date immediately preceding the layoff through the date of the layoff. After an employee's second anniversary date while on

- 3 -

Exhibit 10

layoff, no further vacation would be expected to accrue, since the employee was not working. Of course, if such an employee returned to work, additional vacation benefits would begin to accrue at that time. If an employee was recalled after his first anniversary but before his second anniversary while on layoff, the accrued vacation was credited to his record on his return, and would become part of his earned vacation as of his next anniversary date.

During a prior layoff there were roughly 6 or 8 employees who received their second check (accrued vacation pay) while on layoff, and who ultimately remained on layoff for over three years, thereby terminating their seniority and their recall rights. A couple other employees reached their second anniversary while on layoff and received the second check, but ultimately returned to active employment. A few others quit after having received their second (accrued vacation pay) check while on layoff. As mentioned above, some other employees quit while on layoff, at the instance of prospective employers. These employees received their earned and accrued vacation pay when they quit, without waiting for their first or second anniversary dates following their layoffs. The timing of this layoff is not entirely clear, except that it apparently occurred sometime between 1994 (when the system for paying vacation pay to laid off employees changed) and 1998 (when John Orsulak became Human Resources Manager at Ridgway).

With one exception, every employee whose employment terminated for any reason received a check for any earned and unused vacation pay, as well as for any accrued vacation pay. The sole exception was an employee who owed money to the Company. All involved regarded the debt as roughly the same as the amount of his vacation pay, and he received no vacation pay, in return for which his debt to the Company was cancelled.

Local Union Chief Steward Larry Donachy testified that he considers the collective bargaining agreement to be still in effect despite the shutdown, and he regards himself as still having seniority rights, so that if work became available, he would have the right to be recalled.

The current layoffs are unique in that the Company had not previously ceased operations. There have been no resignations since the January 2002 shutdown.

## Issue

The issue, as agreed to by the parties, is whether the Employer was obligated under Article 11 to pay "accrued" vacation pay.

There is no dispute as to the calculation of the vacation pay benefits involved in this case, with one relatively minor exception. The Union, contrary to the Employer, contends that the proper rate of pay on which the benefits should be calculated includes a 15 cent per hour increase effective July 1, 2002. The parties agree that the amount at issue is approximately $318,000 without the 15 cent increase, which would add about $3,000 to the total.

- 4 -

Exhibit 10

## Position of the Union

The Union asserts that the Company always paid the accrued vacation benefits to any employee who separated from employment, whether by resignation, discharge or retirement, without any requirement that the employee return to active status in order to receive the benefit.

It regards the Employer as attempting to create an additional eligibility requirement for vacation benefits through its reading of Article 11 Section 8, and thereby to bring about a forfeiture of vacation benefits. It submits that there is no evidence of bargaining history supporting the Company's reading of Section 8, and that there is no prior instance where this result had obtained, but to the contrary every employee who left the Company for any reason received accrued vacation benefits.

It points to the case of employees who resigned while on layoff and received all vacation benefits (earned and accrued). It maintains that in the current situation, the Company is permanently severing the employment of all the employees but seeking to avoid the obligation for accrued vacation benefits. It regards the distinction between employees who are permanently laid off and other employees permanently separated from employment as arbitrary and artificial.

The Union maintains that Section 8 addresses the timing of the benefit, rather than whether the employee is entitled to the benefit at all. It cites the case of the previous layoff when employees received their accrued vacation benefits at their second anniversaries, while still on layoff. Thus it disputes that "upon his return to active status" creates a rule of eligibility. It considers the Company's payment of those accrued benefits as contradicting the position it takes in this case.

It contends that the employees in this case were effectively terminated, in that the plant closing is permanent, as are the layoffs. It argues that whether or not the employees formally resigned after being laid off would amount to a distinction without a difference.

The Union views the Company's case as resting entirely upon Section 8, but it notes that Section 8 does not address what happens if the employee does not return after the layoff. It urges that Section 8 could as easily be read to provide for full (rather than pro-rated) vacation benefits to employees who do not return from layoff as for the forfeiture of pro-rated vacation benefits to such employees. In any event, it urges that Section 8 should be read in the context of its negotiation history, namely to provide pro-rated benefits for employees who formerly would have qualified for full vacation benefits by working a single day in the new vacation year, but not to create an additional eligibility requirement.

It asks that the grievance be sustained and that the Company be directed to pay the pro-rated vacation benefits to all bargaining unit employees.

## Position of Management

The Employer argues that Article 11 Section 8 addresses the situation at hand, and makes pro-rated vacation eligibility contingent upon the employee's return to active service, an event that has not occurred. It submits that if the purpose of Section 8 had been only to limit vacation benefits when an employee

- 5 -

Exhibit 10